# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

James P. Gianakis, Esq.
Attorney ID # JG3930
GIANAKIS LAW LLC
315 Madison Avenue, 3rd Floor
New York, New York 10017
Telephone: (646) 979-3750
Facsimile:  (973) 218-2401
Email:  jim.gianakis@gmail.com

Attorney for Plaintiffs

---

|  |  |
|---|---|
| LINNEA MICHAELS, ) | UNITED STATES DISTRICT COURT |
| MARY-KATHRYN ZONI, and ) | SOUTHERN DISTRICT OF NEW YORK |
| REV. SUSAN J. McCONE, ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. _____ |
| v. ) | |
| ) | |
| FELLOWSHIPS AT AUSCHWITZ ) | **COMPLAINT** |
| FOR THE STUDY OF PROFESSIONAL ) | |
| ETHICS, C. DAVID GOLDMAN, ) | **JURY DEMAND** |
| ANDREW EDER, ERIC MULLER, ) | |
| DEBBIE BISNO, NANCY ANGOFF, ) | |
| FREDERICK MARINO, THORSTEN ) | |
| WAGNER, JOHN DOES 1-10, and ) | |
| XYZ CORPORATIONS 1-10, ) | |
| jointly and severally, ) | |
| ) | |
| Defendants. ) | |

---

Plaintiffs, Linnea Michaels ("Michaels"), Mary-Kathryn Zoni ("Zoni") and Rev. Susan J.

McCone ("McCone") (collectively "Plaintiffs"), through their attorney, James P. Gianakis, Esq.,

by way of Complaint against Defendants, Fellowships at Auschwitz for the Study of Professional

Ethics ("FASPE"), C. David Goldman ("Goldman"), Andrew Eder ("Eder"), Eric Muller

("Muller"), Debbie Bisno ("Bisno"), Dr. Nancy R. Angoff ("Angoff"), Frederick Marino

("Marino"), Thorsten Wagner ("Wagner"), John Does 1-10, and XYZ Corporations 1-10, jointly and severally (collectively "Defendants") hereby state as follows:

**PARTIES**

1. At all relevant times to this action, Michaels has lived and continues to live at 162 Withers Street, Apt. 1R, Brooklyn, New York 11211. She was hired to work as the Director of Development with FASPE on or about October 6, 2018 and remained in that capacity until she was terminated in direct retaliation for sharing her concerns on or about October 2, 2019.

2. At all relevant times to this action, Zoni has lived and continues to live at 273 Buffalo Avenue, Apt. 3M, Brooklyn, New York 11213. She was hired to work as the Development Manager with FASPE on or about February 1, 2017 and remained in that capacity until she was constructively discharged on or about November 2, 2018.

3. At all relevant times to this action, McCone has lived and continues to live at 99 Looking Glass Hill Road, Morris, Connecticut 06763. She was hired to work as a fundraising and development consultant with FASPE on or about September 30, 2018 and remained in that capacity until Goldman attempted in bad faith to renegotiate her contract on or about January 10, 2019 and terminated the relationship.

4. At all relevant times to this action, FASPE has been and continues to be a registered 501(c)(3) organization that claims to challenge graduate students and future leaders to recognize and confront their ethical responsibilities as professionals by analyzing the decisions and actions of Nazi-era professionals. FASPE is a New York corporation and has a principal place of business at 404 Fifth Avenue, 3rd Floor, New York, New York 10018.

5. At all relevant times to this action, Goldman has lived and continues to live at 285 Brooks Bend, Princeton, New Jersey 08540. He is a licensed attorney of the State of New York and had practiced law with the firm of McDermott, Will & Emery LLP. Goldman is the founder

of FASPE, serves as Chairman of FASPE's Board of Directors, and controls every aspect of FASPE's mission, vision, funding, decision-making, and day-to-day operations, including issues related to the hiring, supervision, and termination of its employees and contractors.

6. At all relevant times to this action, Eder has lived and continues to live at 167 Uncas Point Road, Guilford, Connecticut 06437. He has been a member of FASPE's Board of Directors and has made repeated inappropriate comments to and about Zoni. When the allegations in this Complaint were raised in an attempt to resolve this matter without the need for litigation, Eder was appointed as the Chairman of a Board of Directors subcommittee that was tasked with investigating the allegations.

7. At all relevant times to this action, Muller has been the Dan K. Moore Distinguished Professor of Law in Jurisprudence and Ethics at the University of North Carolina School of Law, with his office located at 5107 Van Hecke-Wettach Hall, 160 Ridge Road, CB #3380, Chapel Hill, North Carolina 27599-3380. He has been a member of FASPE's Academic Committee and has served as its Director beginning in July 2018. At least four (4) female employees of FASPE have been the victims of and complained about Muller's inappropriate comments and conduct toward them in the FASPE office and/or on FASPE trips.

8. At all relevant times to this action, Bisno has lived and continues to live at 285 Brooks Bend, Princeton, New Jersey 08540. She is the wife of Goldman, serves on FASPE's Board of Directors, and participates in several aspects of FASPE's mission, vision, funding, decision-making, and day-to-day operations, including issues related to the hiring, supervision, and termination of its employees and contractors.

9. At all relevant times to this action, Angoff has lived and continues to live at 123 Everit Street, New Haven, Connecticut 06511. She has been the Associate Dean for Student Affairs and an Associate Professor of Medicine at the Yale University School of Medicine. She

has been a member of FASPE's Board of Directors and the person to whom specifically Zoni turned with complaints and concerns about the manner in which she and other female employees were mistreated by Goldman and FASPE.

10.     At all relevant times to this action, Marino has lived and continues to live at 606 Heron Point Court, Orchid, Florida 32963.   He is a former client of Goldman's, has been a member of FASPE's Board of Directors, and has served on FASPE's Board of Directors' Executive and Finance Committees.   Marino has served as the organization's Treasurer and Secretary, and although Goldman is listed on FASPE's website and acts as FASPE's Chairman of the Board of Directors, Marino signs FASPE's tax returns as the organization's Chairman of the Board of Directors.

11.     At all relevant times to this action, Wagner has been the Executive Director of FASPE and a member of FASPE's Academic Committee.  Wagner works out of FASPE's offices at 404 Fifth Avenue, 3rd Floor, New York, New York 10018 and from Slkovshovedivej 36, DK-2920, Charlottenlund, Denmark.   At Goldman's direction, Wagner helps manage FASPE's mission, vision, funding, decision-making, and day-to-day operations, including issues related to the hiring, supervision, and termination of its employees and contractors.

12.     At all relevant times to this action, John Does 1-10 are currently unknown individuals who were members of the Board of Directors, Academic Committee, and/or senior management level employees who controlled Plaintiffs' workplace and/or supervised Plaintiffs and/or aided and abetted in the commission of conduct complained of herein and/or either acted within the scope of their employment at the workplace during working hours or to the extent they went beyond the scope of their employment, ratified, embraced and added to this conduct.  As the parties engage in discovery, Plaintiffs retain the right to amend the Complaint to add these individuals by name.

13.     At all relevant times to this action, XYZ Corporations 1-10 are currently unknown affiliated entities, who have liability for the claims set forth herein.  As the parties engage in discovery, Plaintiffs retain the right to amend the Complaint to add these individual entities by name.

## JURISDICTION AND VENUE

14.     This Complaint is brought by Plaintiffs seeking injunctive relief and damages pursuant to federal, New York state, and New York City statutory and common law.

15.     The Court has subject matter jurisdiction over this action pursuant to *28 U.S.C. §§ 1331 (Federal Question).*  The matter in controversy involves issues of federal law, including but not limited to allegations of tax fraud, breaches of corporate fiduciary responsibilities, violations of FASPE's 501(c)(3) status, violations of labor law, and employment discrimination, harassment, and retaliation.

16.     The court has personal jurisdiction over Defendants and venue is proper pursuant to *28 U.S.C. § 1391(a)* as Plaintiffs worked for Defendants, and were paid by Defendants, in and through the Southern District of New York.  A substantial part of the events giving rise to this claim occurred within the Southern District of New York.

## STATEMENT OF MATERIAL FACTS

17.     This is a civil action seeking equitable and legal relief in the form of a final judgment of injunctive relief and damages based upon violations of federal, state, and local laws regarding:   (1) discrimination; (2) harassment; (3) retaliation; (4) breach of contract; (5) promissory estoppel; (6) failure to pay compensation and other benefits within thirty (30) days of termination of the employment relationship; (7) breach of duty of loyalty; (8) breach of fiduciary duty; (9) statutory fraud; (10) common law fraud; (11) fraud in the inducement; (12) intentional misrepresentation; (13) negligence and negligent misrepresentation; (14) tortious interference with

actual and/or prospective business dealings; (15) defamation; (16) conversion; (17) unjust enrichment; and (18) estoppel.

18.     FASPE's website states, in pertinent part, that the organization was founded in response to "a growing concern over the rampant breakdown of ethical values in several of our most important and respected professions." It further states: "As we consider FASPE's future and its growth, we believe that we have an increasingly important role to play in addressing current ethical challenges …."

19.     Despite its stated mission, Defendants have abused and failed to protect the legal rights, reputation, and well-being of at least eight (8) hard-working, dedicated and professional women, including but not limited to Plaintiffs, who were either employed or engaged to work by FASPE within the past few years. Indeed, these women have been constructively discharged or were terminated, citing similar, disturbing accounts of Defendants' unlawful comments and conduct, as well as similar, yet ignored pleas to individual members of the FASPE Board of Directors and Academic Committee to assist.

20.     The issues stem from the behavior of FASPE's founder and Board Chairman, Goldman, and in turn, FASPE's efforts to protect its brand. Members of the Board of Directors and Academic Committee have been involved in decisions related to enabling Goldman's behavior in the workplace and by extension in social environments and on business trips, which apparently serve as an extension of FASPE's workplace, and more pointedly, in efforts to excuse what everyone openly recognizes as Goldman's inappropriate comments and conduct. But because it is Goldman, nothing is done about it. Goldman's behavior continues, and employees are told to accept it.

21.     Goldman has engaged in repeated acts of harassment, intimidation, defamation, retaliation, and unlawful conduct, by among other things: (a) speaking to and about women in a

degrading, intimidating, and defamatory manner; (b) making sarcastic and belittling comments about their age, weight, diet, hairstyles, manner of speech, and clothing; (c) mocking their health and mental health status; (d) using sexist and racist terminology (e.g., making "slave" and "slave driver" references to and about a minority staff member) to describe them; (e) insulting them in public and in private; (f) knowingly and maliciously disparaging them and undermining their credibility and reputation; and (g) making inappropriate and unlawful comments about transgender individuals. Goldman has also engaged in unlawful behavior by repeatedly demanding that employees, including but not limited to Michaels and Zoni, are "on call" every hour of every day, including weeknights, weekends, and holidays, including mandatory attendance at out of state "retreats," without regard to federal, state, and local labor laws, and without compensation or concern for travel. Goldman has also engaged in unlawful behavior by directing the misappropriation of donor funds, intentionally misrepresenting for FASPE's and donor tax purposes how funds are being used, and trading personal legal services for donor contributions, all of which implicate the 501(c)(3) status of the organization and are in direct violation of FASPE's own Conflict of Interest policy. When employees, including but not limited to Michaels and Zoni, attempted to set parameters on the manner in which they were treated and things they were directed to do and/or cover up, they became victims of heightened levels of verbal abuse, hostility, insults, sarcasm, and retaliation in the manner in which they were spoken to and spoken about by Goldman.

22. FASPE, through the actions and inaction of its Board of Directors, Academic Committee, and Executive Director, has similarly breached its legal and fiduciary responsibilities by, among other things: (a) acknowledging Goldman's inappropriate comments and behavior, but failing to take any action or to address, investigate, or follow organizational procedures in its issuance of any discipline of Goldman or protection of its employees, including but not limited to

Michaels, Zoni, and the many other female victims of Goldman's behavior; (b) excusing Goldman's inappropriate comments and conduct, to cover up what happened and to protect its brand, which in effect, only further empowers and enables Goldman to continue his behavior with seemingly no consequence; (c) intimidating people from speaking out about Goldman's behavior and the organization's accepted culture; (d) engaging in and excusing and/or enabling similar inappropriate and unlawful comments and conduct by other members of FASPE's Board of Directors, Academic Committee and/or management (i.e., Eder, Muller) toward FASPE's female employees, contractors and/or fellows; (e) willfully turning a blind eye to and enabling unlawful conduct in direct violation of federal, state, and local laws, which have a direct impact on FASPE's 501(c)(3) status and the treatment of its employees and consultants; and (f) eliminating the problem by summarily dismissing people impacted and with knowledge of what has happened, thereby sending a further message about how these matters are viewed by the organization.

### Zoni

23.      Zoni was hired by FASPE and Goldman on or about February 1, 2017, and had no choice but to leave effective November 2, 2018. During that time period, she was consistently and repeatedly subjected to illegal and inappropriate comments and conduct. Eder, on at least five (5) separate occasions, recommended that Zoni wear a "slinky dress" to appeal to FASPE's potential donors, and in turn, to FASPE's Board of Directors. Indeed, even when Eder did not make inappropriate comments in his exchanges with Zoni, he often sought acknowledgment after the fact for "maintaining his decorum" in recognition and as an admission of the times when he had made inappropriate and unlawful comments. When Zoni disclosed Eder's behavior to Goldman, Goldman recognized the inappropriateness and unlawfulness of Eder's conduct and comments, but did nothing to address it or to effect change, instead excusing Eder's behavior by noting one time to Zoni that shortly before Zoni was hired Eder made a one million dollar donation to FASPE,

which Goldman claimed was the largest in the organization's history. Goldman, on almost a daily basis, made crude and inappropriate comments, in the language and tone used, (a) insinuating that there was something untoward going on or that Zoni was somehow at fault for his inappropriate behavior by telling people that Zoni "has a thing for older men" and (b) insulting, belittling, and berating her in front of others. When Zoni addressed it with Goldman, his behavior only got worse. When she addressed it with other members of the Board of Directors, including but not limited to Angoff, they listened but conceded that there was nothing they were willing to do on her behalf given Goldman's control over the entire organization.

24.     Bisno served as the "groomer" for Goldman's female victims. Fully aware of Goldman's repeated misbehavior toward Zoni and other female employees, Bisno curried favor with each new female employee as she was hired, often not initially disclosing that she was Goldman's wife (which was not readily apparent given that their last names are different) and building a relationship, so that Bisno could more easily excuse and attempt to smooth things over when Goldman mistreated a female employee. Bisno frequently reached out to Zoni and other female employees with special favors and amenities, even inviting them to stay for extended periods of time in residences she shared with Goldman in New York City and Princeton, in an effort to distract from the organization's culture of cruelty. As such, Bisno presented herself as the only touchstone and sounding board to whom Zoni and other female employees should and could turn for advice about pleasing Goldman, only to breach their trust by relating those conversations to Goldman. To further complicate matters, Bisno also took charge of decisions related to development at FASPE, even though Zoni technically reported to Goldman. This established a completely inappropriate and unethical work environment, where Zoni was forced to accommodate the whims and assuage the insecurities of both members of the couple.

25.     Zoni discovered that FASPE and Goldman were breaking the law with the manner in which they conducted their business and accounting practices, including but not limited to several instances of tax fraud, misappropriation of donor contributions, misrepresentations regarding how donor funds were being used (e.g., David Rosen's "donations" to FASPE for the express purpose of paying his friend, Jim Ponet, for "consulting services"), Goldman's trading of personal legal services (e.g., for George E. Warren Corporation, Ronald Weiner at Perelson & Weiner) for donor contributions, and the allowance of certain faculty members but not others to use honoraria towards spouses' travel on FASPE trips, freeing them from claiming the honoraria as income, all of which also implicate the 501(c)(3) status of the organization.  When Zoni raised these concerns with FASPE's Board of Directors and senior management, she was again dismissed.  And in turn, the behavior toward Zoni grew increasingly hostile and inappropriate.

26.     Goldman expected Zoni to be "on call" to him every minute of the day, repeatedly reaching out to her on weeknights, weekends, and holidays, and expecting Zoni to cover both her original Development Manager role and the Programs Manager role without any recognition of the additional responsibilities and hours or change in her compensation.  Zoni was never paid overtime wages for all of this extra time, and in fact, Goldman directed Ellen Gilley to inform Zoni in or about September 2018 that effective January 1, 2019, Zoni's compensation was going to be reduced by seventeen percent (17%) without any change in her dual role and expectations.

27.     In combination with Goldman's blatant and flagrant sexism, his model for abuse can be classified as textbook "gaslighting."  Goldman maliciously verbally attacked Zoni, insinuating that she was lying and purposely disobeying him so frequently that she questioned her own reality.  It became Zoni's practice to put as much communication in writing as possible to more easily "prove" that she had done what Goldman asked.  Even then, Goldman still refuted the truth – to Zoni, and about Zoni to others.  Goldman's persistent gaslighting was a tactic to wear

down Zoni.  Despite persistent, degrading comments about Zoni's ability to perform one job, upon hiring Gilley as the new Programs Director, Zoni was tasked with performing two roles, that of Development Manager (for which she reported to Goldman) and Programs Manager, serving under Gilley. It was, of course, impossible for Zoni to perform to Goldman's satisfaction. Goldman often cited that he and Gilley came from the "law world" where Zoni's workload would be considered "rudimentary" and that Zoni would never understand what "real work" looked like. To further degrade her, Goldman required Zoni to meet with Gilley and him at his law offices at McDermott, Will & Emery for a weekly review, which was not only meant to further wear down Zoni, but deliberately took time out of her already impossible schedule. Goldman insisted that such a review was necessary in order to keep Zoni "on track" and to hold her accountable.  In one such meeting, when Zoni questioned Goldman's approach, he responded, "Kindness won't help us run a successful business."  Zoni reminded Goldman that, "Our business is ethics."  In textbook fashion, Goldman would praise Zoni on occasion – usually by way of a sarcastic, backhanded compliment – to confuse her and to make her think that she was in fact improving according to his ever-changing and heightened standards.  But at the same time, Goldman would require Zoni to copy him on all email correspondence so that he could keep track of how she was spending her time.  He also used this system to embarrass Zoni, in front of others, retroactively correcting her and oftentimes chiding her for not wording emails to his exact liking.

28.     Defendants' conduct was severe and pervasive, knowing and malicious, and has resulted in significant emotional, psychological, physical, and financial damage.  As a direct result, Ms. Zoni had no choice but to turn to therapy and medication that continues to this day. Zoni began seeing a therapist weekly, personally incurring the expense because it was not covered by her insurance, and taking medication for the stress, anxiety, panic attacks, and tremors caused by Goldman's persistent harassment and bullying.  She also went to a neurologist.  Finally, with

no hope or help in sight at FASPE, Zoni had no choice but to leave her employment on November 2, 2018, only to face the disturbing reality that Mr. Goldman would block her opportunities elsewhere and continue to reach out to her, thereby inhibiting her ability to heal.

29.     Zoni's attempts to seek future employment opportunities were blocked by Goldman.    Indeed, Michaels was in the room with another FASPE employee when one prospective employer, Andrzej Rojek, who had expressed a desire to hire Zoni for a position at the well-respected Polin Museum, called Goldman as a reference for Zoni.   Goldman spoke extremely negatively and inaccurately about Zoni and told Rojek not to hire her.   As a proximate result of that defamation by Goldman, the offer was never made and Zoni remained out of work and without health insurance for over six (6) months.

30.     After Zoni was constructively discharged, another female FASPE employee named Mia Garcia, who upon information and belief is still employed with FASPE and reports to Goldman, reached out to Zoni citing concerns that she was facing similar abuse to what Zoni and other female employees before and after Zoni had experienced.   Garcia asked Zoni for advice on where to turn and to whom on the Board of Directors she could report Goldman's abuses.   Zoni suggested Angoff.   Garcia responded that she did not feel comfortable reaching out to Angoff because she did not have an established relationship, so Zoni volunteered to reach out to Angoff on Garcia's behalf.   When Zoni reached out to Angoff, Angoff listened to the concerns and insisted that she would champion Garcia's concerns while conceding that Goldman controlled the entire organization.   On this telephone call, Angoff also shared that she had questioned the veracity of Goldman's claims that Gilley had left the organization for reasons stemming from her own elitism, when in fact, Gilley also left because of Goldman's abuse.   Nothing changed in the organization after Zoni's telephone call with Angoff, and Goldman's pattern of control, inappropriate and unlawful conduct only continued.

31.     More than a year after Zoni left FASPE, Goldman is still harassing her, including reaching out to her by text message to sarcastically and condescendingly seek professional favors related to FASPE.

32.     Goldman and another member of FASPE's Board of Directors, Fred Marino, recognized how they had mistreated Zoni and often expressed concern to several people, including existing FASPE employees, for several months after Zoni had no choice but to leave the organization that she might sue the organization and Goldman for the manner in which she was mistreated.

**Michaels**

33.     Michaels was recruited to join FASPE and follow Zoni in the role of Director of Development, and within one month, experienced the same harassing, bullying, intimidating, sexist and racist discriminatory behavior from Goldman.  Michaels also witnessed Goldman's similar treatment of several other female staff members and consultants.  These women shared their respective experiences of Goldman's mistreatment and named members of the Board of Directors and Academic Committee to whom they turned for help, only to be given similar reasons for why no one would confront or discipline Goldman, and how following these reported concerns, Goldman's behavior toward them not only continued but escalated.  In one instance, Goldman introduced Garcia, a minority female employee, as FASPE's "Simon Legree," the slave owner who ordered the death of his slave by flogging in Harriet Beecher Stowe's novel, Uncle Tom's Cabin.  Hearing this, Michaels encouraged Garcia to report the comments directly to FASPE's Executive Director, Wagner.  Upon receiving the complaint, Wagner responded:  "Well then you'll have to keep your whip under the desk."  Michaels witnessed the statement by Wagner and noted how it was both inappropriate and unlawful.  She also encouraged Garcia to report both comments to FASPE's Board of Directors.  Garcia replied that, based upon her understanding of

how things were handled at FASPE, she feared being further harassed, discriminated against and/or terminated.

34. During her time with FASPE, Michaels also witnessed Goldman making repeated, derogatory comments about transgender individuals, which made Michaels very uncomfortable. Goldman repeatedly commented about a specific fellow, who was transgender, and threatened to "out" the individual to other members of FASPE, including to other fellows. Goldman also made repeated comments about the appearances of transgender people and instructed Michaels to make sure that all fellow applicants submitted headshots with their applications so that he could determine whether or not they were transgender and, in turn, "acceptable" to him. Michaels repeatedly expressed to Goldman her surprise, disagreement, disappointment, and significant concern about his comments. Each time, Goldman condescendingly dismissed Michaels. And following each encounter, Goldman's behavior grew increasingly hostile and inappropriate.

35. Similar to Zoni, Michaels was expected to be "on call" at all times and was never paid for any overtime hours, in the United States or in Europe. Michaels also discovered that FASPE and Goldman were breaking the law with the manner in which they conducted their business and accounting practices with Perelson & Weiner LLP, including but not limited to several instances of tax fraud, misappropriation of donor contributions (e.g., Ari Goldman calling attention to using donor funds to subsidize "adult trip" expenses for "rich people"), misrepresentations regarding how donor funds were being used (e.g., David Rosen's "donations" to FASPE through the JANA Foundation, which Goldman refers to as "the payment mechanism that funds Jim Ponet," for the express purpose of paying Rosen's friend, Jim Ponet, for "consulting services"), and Goldman's trading of personal legal services (e.g., for George E. Warren Corporation) for donor contributions, all of which also implicate the 501(c)(3) status of the organization. When she raised these concerns with FASPE senior management, she was again

dismissed. Following this, Goldman's and the Board Members' behavior toward Michaels grew increasingly hostile and inappropriate.

36.     By October 2019, Goldman's hostile behavior towards Michaels reached a pinnacle, jeopardizing both her ability to effectively function in her role at FASPE and her personal mental and physical health.  By this time, Michaels had begun seeing a therapist to address the undue stress and anxiety resulting from being consistently and repeatedly harassed, bullied, intimidated, defamed, and discriminated against by Goldman.  She turned to members of FASPE's Board of Directors and Academic Committee, who listened sympathetically and acknowledged the concerns, but took no visible action to effect change.  Accordingly, Michaels retained legal counsel to send a letter to FASPE's Board of Directors on October 2, 2019, reiterating her concerns and formally requesting assistance in having them addressed.  The very next day, on October 3, 2019, in a direct form of retaliation, FASPE cut off all communications with Michaels and cut off access for Michaels to her FASPE email account, to the FASPE shared drive, to the back end of FASPE's website, and to her key access to FASPE's physical office, all steps that effectively cut off her ability to perform her job.

37.     To make matters worse, while Defendants represented through legal counsel that they had formed a Board of Directors subcommittee to investigate the concerns and were "taking the allegations very seriously," Michaels came to find out that Defendants had actually processed her termination of employment, stating maliciously and incorrectly to, among others, the New York Department of Labor and Unemployment, that she had abandoned her position with the company.  As a result, Michaels was initially denied unemployment benefits.  She was forced to appeal that decision, and by sharing the October 2, 2019 letter and explaining the facts to the New York Department of Labor and Unemployment (i.e., Hazel Wolf), her eligibility to collect unemployment benefits was confirmed.  Michaels, however, remains unemployed, seriously

damaged by FASPE and Goldman, and without health insurance during the worst global public health crisis in recent history. Defendants have also purposefully and unlawfully failed to pay Michaels the accrued but unused paid time off benefits to which she was entitled according to the law and FASPE policy.

**McCone**

38.     McCone was hired as an independent contractor at around the same time as Michaels, on or about September 30, 2018. She is a recognized professional with over 25 years of success in the field of fundraising and development for not-for-profit organizations.

39.     McCone and Goldman took great lengths to negotiate a twelve (12) month consulting agreement, which quickly became a six (6) month consulting agreement at Goldman's insistence that the relationship would be long term and that the six (6) month arrangement would just allow them to get going and would be extended with recognition of McCone's anticipated value and contributions. Goldman explained the mission and vision of FASPE, and McCone made clear that she could only endorse and raise funds for an entity in whose mission she believed and whose work she respected. Goldman also requested that McCone's consulting services include (a) mentoring Michaels, (b) training individual Board Members in how to solicit contributions, (c) expanding the roster of companies that would hire FASPE for ethical training, and (d) increasing the number of law firms that would contract with FASPE for its continuing education program, all of which McCone gladly agreed to do. Notably, McCone explained that while her regular rate, and the regular rate of an experienced development consultant, was significantly higher (i.e., $750-$1200 per day), she would forego other opportunities and agree to a reduced rate in reliance upon Goldman's representations. Accordingly, pursuant to the express terms of the deal, FASPE agreed to pay McCone the sum of $20,000.00 for her consulting services that commenced on October 15, 2018, and was scheduled to run through April 15, 2019.

40.     In direct reliance on that contractual arrangement, McCone declined, and Defendants knew that McCone declined, other consulting opportunities, and invested her well-established and recognized professional reputation, including engaging her extensive professional fundraising network, to promote and to support FASPE.

41.     In direct reliance on that contractual arrangement, McCone spent significant time and personal finances in her efforts to promote and to support FASPE, including meeting with and mentoring Michaels.  Pursuant to the express terms of the agreement, FASPE was to reimburse McCone for her business-related expenses.

42.     Despite McCone's efforts to meet with Goldman and members of FASPE's Board of Directors and staff in furtherance of her efforts to promote and to support FASPE, Goldman repeatedly, among other things (a) cancelled meetings with her, and (b) blocked McCone from contact with other members of FASPE's Board of Directors and from members of FASPE's staff other than Michaels.

43.     In less than three (3) months, McCone (a) addressed every area of work originally described in the agreement; (b) contacted by email or in personal meetings twenty-two (22) individuals, whom she regarded as potential donors for FASPE, had follow up meetings or further discussions with many of them, and supplied FASPE with those names and periodic status reports of those contacts; (c) mentored Michaels in areas of development; (d) made suggestions for Gala honorees and "add-on" fundraising opportunities (an idea she proposed to Goldman and he loved); (e) agreed to serve as Co-Chair of FASPE's Gala at Goldman's specific request; and (f) agreed to discussions with several law firms, with the Union Theological Seminary, and with three (3) major financial institutions as possible participants in the FASPE ethics seminars.

44.     On January 8, 2019, without notice or warning about the agenda, Goldman convened a meeting with McCone and Michaels, during which Goldman surprised Rev. McCone

by telling her that FASPE and he had no intention of paying her January 2019 fee that was due by January 15, 2019, for which McCone had already done work. Goldman added that his sole purpose in hiring McCone and sole measure of evaluating her engagement was the number of people she personally introduced to him and that she was not doing her job.

45. Two days later, in an email dated January 10, 2019, which was drafted by and sent at Goldman's direction, McCone was informed that Goldman was not satisfied with her work and was unilaterally changing the consulting agreement, without additional consideration, to pay the remaining $9,950.00 of her $20,000.00 fee only if she provided eight and a half (8.5) more months of service – extending the original six (6) month term to fourteen and a half (14.5) months! Goldman engaged in a typical "bait and switch" – promising one thing and then changing it shortly after the ink was dry – unfortunately not practicing what FASPE and he preached and making it clear to McCone that the relationship could not continue.

46. McCone responded professionally and respectfully, but noted for Goldman that she believed their original contract, on which she had relied to her financial and professional detriment, is legally enforceable, that she had delivered everything asked of her, and that FASPE and he should honor their commitment. More specifically, she requested that FASPE pay the agreed upon consulting fees and the out-of-pocket business expenses that she had incurred in connection with meeting with potential donors and FASPE employees, exclusively for FASPE's benefit.

47. FASPE and Mr. Goldman ignored those requests; and to make matters worse, McCone, understands that Goldman went out of his way to disparage her and her reputation within FASPE and the industry citing among other things her "advanced age" and "unprofessionalism."

48. Goldman made unacceptable comments regarding McCone's age, on multiple occasions, with witnesses, including but not limited to Goldman's wife, Bisno, who also serves on

FASPE's Board of Directors and who at one meeting with Goldman had to jump in to apologize for the inappropriateness of Goldman's comments and in an attempt to quiet her husband.

49.     As a direct and proximate result, McCone was also suddenly out of a job that she had relied upon to be for a full year and had to either sit on the sideline and wait or explain to her network of donors why she was no longer with FASPE after only three (3) months, clearly damaging the professional, well-respected reputation that she had established in the industry over three (3) decades.

50.     FASPE's and Goldman's effective termination of McCone's contract substantially impaired McCone's ability to pursue her development career in other contexts for a substantial period of time, making it ethically and practically impossible for her to engage her personal roster of high donor prospects with whom she had engaged on behalf of FASPE for other entities or causes, thereby negatively affecting her income for at least the duration of 2019.

51.     During her period of working with FASPE and in the aftermath of Goldman's abrupt change in how he treated her and their contractual relationship, McCone witnessed Goldman's behavior toward other females and came to understand that she is one of the many victims in a long line of hard-working, dedicated, and professional women who experienced Goldman's hostile work environment.

**Professional and Community Impact**

52.     Plaintiffs were hired to help build and service Defendants' business, network, and reputation. Consistently and repeatedly, with clear malicious and selfish intent, Goldman abused, manipulated, and bullied his way to advancing his agenda, holding back money that was owed, tarnishing professional and personal reputations, and severely damaging the emotional, psychological, physical, and financial health and well-being of one victim after another.

53.     Plaintiffs are not the only victims of Defendants' unlawful and inappropriate conduct. There are at least eight (8) women who have been treated in a similar manner, and as a result, lost their positions with FASPE and have been severely impacted personally and professionally.

54.     In further evidence of their bad faith, Defendants have unlawfully misrepresented the makeup of FASPE's Board of Directors on its company website and in communications, including with respect to Mr. Michael Eichenweld, Mr. Daniel Weisberg, and Ms. Stav Ziv.

55.     FASPE and Goldman have committed serious acts of tax fraud in their business and accounting practices that have an impact on, among other things, FASPE's 501(c)(3) status, contributions from donors, and legal services that have been provided.

56.     Goldman has violated specific rules of professional conduct and ethics that govern Goldman's behavior as a licensed attorney and as a fiduciary of a not-for-profit organization.

## **RELIEF REQUESTED**

WHEREFORE, for the reasons stated herein, Plaintiffs demand judgment against Defendants, jointly and severally, under any and all of the following causes of action:

    a.      Discrimination based upon gender;

    b.      Discrimination based upon age;

    c.      Harassment based upon gender;

    d.      Harassment based upon age;

    e.      Retaliation based upon gender;

    f.      Retaliation based upon age;

    g.      Retaliation as a result of reporting unlawful activity as a whistleblower;

    h.      Unlawful discrimination under the New York State Human Rights Law;

i.      Unlawful harassment under the New York State Human Rights Law;

j.      Unlawful retaliation under the New York State Human Rights Law;

k.      Breach of contract;

l.      Promissory estoppel;

m.      Failure to pay compensation and other benefits within thirty (30) days of termination of the employment relationship;

n.      Breach of duty of loyalty;

o.      Breach of fiduciary duty;

p       Common law fraud;

q.      Statutory tax fraud;

r.      Fraud in the inducement;

s.      Intentional misrepresentation;

t.      Negligence and negligent misrepresentation;

u.      Tortious interference with actual and/or prospective business dealings;

v.      Defamation;

w.      Conversion;

x.      Unjust enrichment; and

y.      Estoppel.

WHEREFORE, for the reasons and causes of action stated herein, Plaintiffs demand a final judgment against Defendants, jointly and severally, for relief, including but not limited to:

a.      Immediate and permanent injunctive relief compelling Defendants to refrain from having any contact or communications with Plaintiffs;

b. Immediate and permanent injunctive relief compelling Defendants to refrain from restricting Plaintiffs in any way from seeking employment opportunities with another company or organization of any kind;

c. Compensation of not less than $200,000.00 owed to Plaintiffs pursuant to the terms of their respective employment and/or engagement, including but not limited to wages for regular, overtime, and contract hours of service;

d. Treble (triple) damages on the amount of compensation owed based upon the refusal of Defendants to pay Plaintiffs beyond the required date upon which said compensation became due to Plaintiffs;

e. Interest, calculated at the statutory rate, for all compensation owed to Plaintiffs from the date such payments became due to Plaintiffs to the date they are actually paid;

f. Compensatory damages of not less than $750,000.00 for the acts of unlawful discrimination, harassment, retaliation, defamation, breach of contract, fraud in the inducement, tortious interference, unjust enrichment, conversion, intentional and/or negligent infliction of emotional distress, pain and suffering that Plaintiffs have been forced to endure and that will continue to affect them adversely;

g. Punitive damages of not less than $2,000,000.00 for the malicious and intentional manner in which Defendants decided to treat Plaintiffs and many other women who have been subjected to the same hostile and inappropriate work environment;

h. Attorneys' fees and costs associated with Plaintiffs having to pursue this legal action to retrieve earned, but unpaid wages, and other benefits owed to

him by Defendants, to address how they were treated, and to ensure that Defendants do not restrict and/or adversely affect in any way their ability to seek employment opportunities with another company; and

i.      Such other relief as the Court deems just and equitable based upon the position taken by Defendants to avoid their legal obligations.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs hereby demand a trial by jury on all questions of fact the Complaint raises.

## DESIGNATION OF TRIAL COUNSEL

James P. Gianakis, Esq., is hereby designated as trial counsel for Plaintiffs in this action.

## CERTIFICATION

In accordance with Local Civil Rules, I hereby certify to the best of my knowledge that the matter in controversy in this action is not the subject of any other action or proceeding pending in any court or arbitration tribunal that no such action or arbitration is presently contemplated.

I further certify that at present time, I am unaware of any other parties who should be joined in this action.

Attorney for Plaintiffs


Dated:  July 14, 2020              By:      _s / James P. Gianakis_____
                                            JAMES P. GIANAKIS, ESQ.
                                            Attorney ID # JG3930

                                            GIANAKIS LAW LLC
                                            315 Madison Avenue, 3rd Floor
                                            New York, New York 10017
                                            Telephone: (646) 979-3750
                                            Facsimile:  (973) 218-2401
                                            Email:  jim.gianakis@gmail.com